EXHIBIT 2

Page 1

1

2

UNITED STATES DISTRICT COURT

3

DISTRICT OF CONNECTICUT

4

- - - - - - - - - - - - - - - - - - - - x

5   WILLIAM E. MIKE, Individually and      |
    on behalf of other similarly situated
6   individuals,                           |
                        Plaintiff,          Civil Action No.
7                                          | 3:02 CV 2239 (DJS)
                        vs.
8                                          | June 3, 2003
    SAFECO INSURANCE COMPANY OF
9   AMERICA,                               |
                        Defendant.
10  - - - - - - - - - - - - - - - - - - - - x    COPY

11

12

13              DEPOSITION of WILLIAM MIKE

14

15

16              Taken at the request of the Defendant
        before Tiffany V. Pratt, a Court Reporter and Notary
17      Public within and for the State of Connecticut,
        pursuant to Notice and the Federal Rules of Civil
18      Procedure at the offices of Jackson Lewis, LLP,
        55 Farmington Avenue, Hartford, Connecticut, on
19      June 3, 2003, commencing at 10:36 a.m.

20

21

22

23              Tiffany V. Pratt, LSR #00128
            BRANDON SMITH REPORTING SERVICE, LLC
24                  44 Capitol Avenue
            Hartford, Connecticut  06106
25                  (860) 549-1850

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

---

Page 28

1    BY MS. STRANGE:

2        Q    And what about the -- like the nature of the

3    claims?  Did that differ by territory?

4        A    I couldn't really answer that, because I haven't

5    done claims in other territories, but I would not think so

6    or not greatly.

7        Q    Now, for the entire time that you worked at

8    Safeco -- let me just put a time frame on it.  You were

9    hired in April 2000; is that correct?

10       A    Yes, it is.

11       Q    For the entire time that you worked at Safeco, did

12   you have the same territory?

13       A    No.

14       Q    What was the first territory that you had at

15   Safeco?

16       A    The state.

17       Q    How long did you have that territory?

18       A    Maybe three or four months.

19       Q    I'm going to get back to that, but then what was

20   your next territory?

21       A    Some what a development of the locale of my

22   current.

23       Q    So it was similar to the territory you had when

24   you were speaking with Jeff?

25       A    No.  It was then smaller.

---

Brandon Smith Reporting Service

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 29

1     Q     Did it gradually become bigger?

2     A     Yes, it did, and some of the growth was prior to

3     Jeff.

4     Q     Was the growth in territory based on you obtaining

5     more experience to handle a bigger territory?

6     A     I'd say yes, little more experience, showing the

7     capability that I can handle it.

8     Q     So when you had this conversation with Jeff in

9     2002, were you confident that you were capable of handling

10    the territory you had?

11    A     Yes, I was.

12    Q     And did Jeff discuss with you anything other than

13    that he thought you should do your scheduling differently?

14    A     I rode with Jeff one day.  In other words, he

15    spent the day -- right in the morning, got in my car; we

16    went to my first appointment.  My first appointment that day

17    was close to an hour away, one way.  It was up by Bradley,

18    which is technically out of my area, yet we are told not to

19    return work when we get the work.  So Jeff sat with me while

20    we left my house, started to drive up to the airport.  I was

21    making phone calls on the cell phone for contacting the

22    initial appointments that I had that day.  He spent the

23    whole day driving with me and gave me a commendation on my

24    phone technique.  Handled everything I needed to do, went

25    back to the office, had a glitch, a technical glitch, which

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 38

1   you perform your position at Safeco as a claims rep?

2           MR. PANTUSO:  Object to form.

3       A    Repeat that or rephrase.

4   BY MS. STRANGE:

5       Q    Let me rephrase that.

6           Do you believe that your experience, for example

7   your extensive automobile experience, helped you perform

8   your position at Safeco?

9       A    Absolutely.

10      Q    What is it about that experience that would help

11  you perform that position?

12          MR. PANTUSO:  Object to form.

13      A    I could talk turkey with the shops that are saying

14  this damage caused that damage, or because of this, that

15  happened.  My mechanical knowledge was vastly greater than

16  any of the guys in the body shops.

17  BY MS. STRANGE:

18      Q    Were you able to use that mechanical knowledge to

19  challenge the body shops?

20      A    If I needed to, yes.

21      Q    When you say talk turkey with the guys in the

22  shop, did you actually negotiate with the guys in the shop

23  as a claims rep at Safeco?

24      A    I did not do much negotiating.  In other words,

25  you know, there was X damage on the car, repairs are either

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

William Mike

1    repair the panel, replace the panel with an aftermarket

2    part, replace it with an LKQ, which is a factory part but

3    used, or buy a brand new part.

4        Q    Do you think your auto experience helped you to

5    understand these concepts of repair, replace, LKQ?

6             MR. PANTUSO:  Object to form.

7        A    I do, yeah.

8    BY MS. STRANGE:

9        Q    And when you say talk turkey with the guys, what

10   do you mean?

11       A    Everything that we did had to be an agreement, for

12   an agreed cost.  My purpose was getting an agreed cost to

13   repair ACOR or a starting point for an agreed cost.  Yeah,

14   potentially there's hidden damage, potentially there's going

15   to be a supplement, potentially there may be additional

16   parts, so most often instead of my looking at it myself, I'd

17   go get the owner, and we'd start talking, you know, what do

18   you think, what do you got, you can't open the hood, what do

19   you think about the front rail.  We'd go back and we'd look

20   and decide.  If we're on the same page, I agree with them.

21   If we're not, I disagree with them.

22       Q    When you say agree with them or disagree with

23   them, are you talking about the owner?

24       A    Shop owner or vehicle owner, yeah.

25       Q    And if you were in agreement with a shop owner,

Mike vs Safeco Insurance Co.

6/3/2003                                                         William Mike

Page 40

1    but not a vehicle owner, what would happen?

2         A    There's a can of worms.  I look at a car.  It's at

3    the shop.  The owner's at work, you know, 30 miles away.  I

4    would try to repair the car as cheaply as possible.  If the

5    shop owner agrees to some of the parts and repair

6    techniques, methods, etc., technically it still has to go to

7    the owner and say, This is what we're going to do with your

8    car and this is how we're going to do it.  If I'm running an

9    aftermarket part and he's not happy with that, I can't force

10   it down his throat.  So right off the bat, that's going out

11   the door; there's going to be a supplement for a new part.

12   My attempt to use either an aftermarket part or recycled

13   part also went out the door, too, because the owner didn't

14   agree to it.

15        Q    What's an aftermarket part?

16        A    A stamped sheet metal part that is not made by the

17   OE vendor.

18        Q    What is a recycled part?

19        A    It's made by the OE vendor, but it's in a

20   junk-yard on another car.

21        Q    What's an OE vendor?

22        A    Original equipment brand new.

23        Q    When you looked at a car, would you have to decide

24   whether to use an aftermarket part versus a recycled part?

25        A    Yes.  Theoretically, if I'm looking at 15 parts or

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                      William Mike

Page 41

1    20 parts on a car, each one of those should be dealt with in

2    that respect.  Obviously, for the company it's a matter of

3    saving money.  But to a certain extent the owner has to

4    agree with that.  The owner definitely has to agree with

5    that.  There's no place in his policy that says he has to

6    use aftermarket parts.

7         Q    As the claims representative, was it part of your

8    job to try to convince the owner to use aftermarket parts?

9              MR. PANTUSO:  Object to form.

10        A    Not to convince.  I would say to try to sell.

11   BY MS. STRANGE:

12        Q    Would you typically on a claim have a conversation

13   with the owner about whether they'd be willing to use

14   aftermarket parts?

15        A    Yes, I would.

16        Q    And would this come before or after you talked to

17   the guys in the shop?

18        A    Theoretically, I'm dealing with the shop.  The

19   shop owner says he's going to use an aftermarket part here,

20   use an LKQ there.  If I have a phone number, I would get on

21   the phone, call the owner, "I just left Joe's shop.  Joe and

22   I talked about your car.  This is what we're going to be

23   doing with it."  So it was more communication down the line

24   than anything else.  If I tell "Joe Shmo" that his 2001

25   Buick is going to be getting an aftermarket fender, Joe is

Mike vs Safeco Insurance Co.

6/3/2003                                                      William Mike

---

Page 44

1    rep at Safeco settle the claim?

2            MR. PANTUSO:  Object to form.

3       A    I don't settle.  I get an agreed cost.  I don't

4    settle any claims.  My purpose is the car, what's the car

5    going to take to fix it.

6    BY MS. STRANGE:

7       Q    Did you have certain authority when you were a

8    claims rep at Safeco?

9            MR. PANTUSO:  Object to form.

10      A    I had a $5,000 authority level.  Most of the other

11   reps were considerably higher than that I believe.

12   BY MS. STRANGE:

13      Q    What is an authority level?

14      A    It just meant anything under that dollar amount I

15   could enter and put through myself, and it would

16   self-approve because of my authority level.  What it

17   actually does is decrease the amount of work going up the

18   line, because anything over $5,000 goes to the boss or the

19   next approval level.

20      Q    When you say anything over $5,000 goes to the boss

21   or the next approval level, while you were a claims rep, did

22   the next approval level typically approve your claims that

23   were over $5,000?

24           MR. PANTUSO:  Object to form.

25      A    Did they typically approve them?

---

Brandon Smith Reporting Service

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                      William Mike

Page 45

1    BY MS. STRANGE:

2        Q     Right.

3        A     Well, yeah.

4        Q     And when they were approving them, what

5    information were they relying on?

6        A     I don't know.

7        Q     Describe for me what you would provide if you were

8    asking to go above the authority level.

9        A     I put through a $16,412.12 payment, and the system

10   goes, "This exceeds your authority level." And then I just

11   hit a key, and it goes to approval. Where it goes from

12   there is kind of unclear to me, and what happens at that

13   point, I don't know, either.

14       Q     All right. Do you know whether you ever had

15   claims above your authority level approved while you worked

16   at Safeco?

17       A     Of course.

18       Q     Do you recall ever having a claim rejected that

19   was over your authority level?

20       A     No, I don't think so.

21       Q     And when you sent it in for approval, what

22   information were you sending in?

23       A     I don't know. Like I say, I'm back in my home

24   logging on, doing the documentations, the payments,

25   everything else, put the payment to a certain guy,

Brandon Smith Reporting Service

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 53

1      A     Yes.

2    BY MS. STRANGE:

3      Q     Now, you also said that the information you would

4    submit, if a claim exceeded your authority level, there was

5    something about payment?  What was that information that you

6    submitted?

7      A     The system would know that my authority level is

8    $5,000, so it would not allow me to put the payment

9    through.  It would go to the boss.

10     Q     And the payment, is that the payment that you

11   arrived at after talking to the shop and the customer?

12     A     Right, that would be the agreed cost to repair or

13   starting point.

14     Q     For you to submit a claim either below or above

15   your authority level, did everyone have to agree to the

16   payment?

17     A     Yes.

18     Q     When I say everybody, did the shop and the owner

19   have to agree with you as to what the payment was?

20     A     Yes.

21     Q     How did you come to that determination of what the

22   payment should be?

23     A     The laptop supplied by Safeco had a Pathway system

24   on it, which was a database for calculating parts,

25   materials, labor, and everything else.

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

---

Page 58

1    Mitigation be brought in?

2        A    No.   He actually made the recommendation to me.   I

3    just found it silly to waste the money on something I knew

4    that was not related, but it was just an instance where for

5    the customer service and piece of mind we were going to do

6    it for him.

7        Q    You said there were a lot of related claims

8    issues.   Have there been any other related claim issue where

9    you decided it was not related and you were able to convince

10   the customer of that?

11       A    There have been some like that.   There have been

12   some where I'm quite convinced it's unrelated damage that

13   did require a second inspection, and Fran was involved in at

14   least one of those.

15       Q    And when they require a second inspection, do you

16   tell the claimant you're doing a second inspection?

17       A    I don't do the second inspection.   That would be

18   from the other people.

19       Q    When you say "the other people" --

20       A    Jeff or Fran, whoever is going to actually go out

21   there.

22       Q    I see.  So a second inspection --

23       A    It's just another set of eyes to go look at it and

24   put his logic together, see if we're on the same page.

25       Q    In your claims, would you typically get a second

---

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

William Mike

Page 62

1    going to come up with a number.  And if he's that insistent

2    it's repairable, it's easier to get a negotiated time.  And,

3    again, if he's 18, I'm at 14, we're not that far apart.

4    It's pretty quick and easy to sometimes just split the

5    difference and call it a repair or, you know, whatever needs

6    to be done.

7        Q    Are there any other circumstances where you and

8    the people at the body shop may have to work out your

9    differences on a claim?

10       A    No, because everything is pretty much cut and

11   dry.  Like I say, if it's an aftermarket part, this is paint

12   and materials on Pathways.  If it's an LKQ part, I may have

13   to talk to the shop, because an LKQ is on a car, it's in a

14   junk-yard, they have to take it off the car, put it on a

15   truck, bring it there, and hopefully it's going to be

16   something that works.  Hopefully it's not going to be in

17   worse shape than what they're trying to repair, and

18   potentially it may need an hour of work, cleanup kind of

19   things, to be able to use it.

20       Q    An LKQ part, that's something that comes out of

21   a --

22       A    That's what we were just talking about, out of a

23   junk-yard, but it's an original part.

24       Q    In the circumstances where the shop uses an LKQ

25   part, would you have to approve that use?

Mike vs Safeco Insurance Co.

6/3/2003                                                              William Mike

Page 63

 1      A    Would I have to approve it?

 2      Q    Correct, to settle the claim.

 3           MR. PANTUSO:  Object to form.

 4      A    No.  And I found, in essence, basically nobody can

 5   argue with LKQ.  It's what we owe the owner.  The shop can't

 6   argue there's going to be a fit problem.  And I spent a lot

 7   of time looking for LKQ, because it was the most efficient

 8   way to handle the problem.

 9   BY MS. STRANGE:

10      Q    When you say "looking for LKQ," what do you do to

11   look for it?

12      A    I can punch it in on the computer and then do this

13   thing and come up with some potential sources of it on the

14   laptop.  Then I have to get on the phone, actually see if

15   they got it, if it's usable.  It may have been sold

16   yesterday, or I'll quote it it's there today, but by the

17   time the estimate and the car gets to a shop, the part is

18   gone, so that's additionally more work for me.

19      Q    Would you negotiate the price on the LKQ part, or

20   is that a fixed price?

21      A    It's a fixed price.  I might say, Gosh, the new

22   door is 600, you want 400 for this one, and now I got to

23   mark it up for the shop and save Safeco some money that way.

24      Q    Now, what would you look at if you're deciding

25   whether to, say, repair or replace?  What would you take

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

William Mike

Page 64

1    into account to make that decision?

2        A    It's simply two things; dollars and cents and an

3    agreement.

4        Q    Would you look at the labor cost of repair versus

5    replace?

6        A    I can look at the price comparison aftermarket,

7    repair and LKQ.  So, in essence, it kind of comes up with,

8    out of that, whatever is the cheapest method.  If that

9    cheapest method is available and if it's agreeable to

10   everybody, and that's usually aftermarket, then we go with

11   that.  Next step up, nobody can complain about LKQ.  Is it

12   available?  I'll call Terryville.  They'll say call Route 16

13   Mass.  They'll say call New York, which finally gets me back

14   to Rhode Island, and may find one, may not find one.

15       Q    Does the model or the year of the car make a

16   difference in terms of what you're going to do?

17       A    Initially I was told that a zero to two year old

18   car was new parts.  That changed, too.

19       Q    When did that change?

20       A    With recent management.  We are told to try to

21   sell -- I understand how to save money.  I understand the

22   dynamics of saving money.  But I understand that when they

23   want us to try to short people for what they're due, I don't

24   think it's right.

25            The other thing that they tried pushing a lot was

Brandon Smith Reporting Service

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 65

1    appearance allowances.

2        Q    What's an appearance allowance?

3        A    As an example, a 2000 Lincoln had a real hard hit

4    in the back.  He was our insured.  The corner of the trunk

5    moved forward from the smack and hit the back glass in the

6    back of the back seat, had a large 6-inch, very noticeable

7    scrape.  It was a two-year-old car.  I wrote up a new back

8    glass.  The person reviewing the estimate, Jeff, told me I

9    did absolutely the wrong thing, because what I was supposed

10   to have done was try to sell the guy an appearance

11   allowance.  This would have been my calling up -- taking the

12   time to call up the owner and explain, "Well, I'm down

13   here.  I looked at the car.  We got some serious damage in

14   the back of this.  I did see that this happened, you know,

15   the trunk moved forward, hit the glass.  Would you like to

16   take $200 for this?"  I would feel like a used car

17   salesman.

18            I also think it's probably the quickest way to

19   lose a customer.  I also think it's not time effective.  And

20   I also think -- and I have seen this, where they'll say,

21   "Well, yeah, I'll take that."  I go in and I do my ROC, he

22   agreed to this today.  Next week he changes his mind.  You

23   know what happens then?  Mr. Bill's got to do more work.

24       Q    What do you have to do when he changes his mind?

25       A    I have to, first of all, authorize the shop to

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                          William Mike

Page 66

1    change the glass again.  Hopefully the aftermarket glass can

2    go back -- I'm sorry.  That was the scratched glass.

3    Hopefully the -- well, okay.  In essence, I would have to

4    get his appearance allowance money back.  So he has to write

5    us a check back.  I have to open the file for a supplement,

6    which is additional paperwork for parts.  Once everything

7    else is ironed out, pay for the additional glass, sealer,

8    moldings, whatever else may have come up for additional

9    parts to fix the car and handle it as a supplement.

10              I write approximately 30 to 40 percent supplement

11   rate, which means -- and a lot of these guys only write

12   10 to 12 to 15 percent, which means I do not just give away

13   the money.

14        Q    What is a supplement rate?

15        A    The amount of estimates you've done that needed

16   supplements.  If I did 100 in a month, 40 of them I'm doing

17   supplements on.

18        Q    As a claims rep, did you try to do less

19   supplements?

20              MR. PANTUSO:  Object to form.

21        A    Not necessarily, because some of these supplements

22   involved unseen damage that you couldn't see.  A lot of

23   these involved price change differences.  And we got updated

24   CD's, yet still push comes to shove.  I'm going back in, and

25   some of these I'm changes 50 prices on, and, number one,

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

William Mike

Page 78

1    for having a lienholder included on the check as well as the

2    shop or the owner?

3        A    Initially, no.  New management, yes.  But as I

4    just said to you, when I get my assignment sheet, I don't

5    have a lienholder showing, so there's lack of information

6    right off the bat.  If there is a lienholder, it's going to

7    take an additional bunch of time to find out.

8        Q    You talked before about potentially hidden

9    damage.  Is that anything that would come up after you

10   submitted a claim for payment?

11       A    Right.

12       Q    What are some examples?

13       A    I mentioned to you earlier if the car is damaged

14   on the left side, the doors cannot be opened, don't know

15   what the floor looks like inside the car.  Maybe you can

16   crawl down and look underneath and get a little bit of idea,

17   but not being able to have a good idea of what's there, I'm

18   not going to put dollars and cents on it.  So I'll tell the

19   shop, and we'll get the agreement, here is where we're going

20   to start.  I'll have an idea on the value of the car, how

21   much I can spend, authorize them to start on this thing.

22   And once they get to the point where they have found

23   additional damage or have a little idea what we need for

24   more parts, they get back to me, give me a call.  If we can

25   square away on the phone, we'll do that.  If I got to get

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 79

1    back for a second inspection, we'll do it that way.

2        Q    What are hidden parts?  What's that?

3        A    If the floor is buckled hard, hidden parts can be

4    anything from sheet metal to mechanical components to a

5    door, power motor, a door glass, anything that you can't see

6    up front.

7        Q    And those hidden parts people may have on their

8    cars?

9        A    They're just -- well, no.  They're put there from

10   the factory.  You know what I mean?  They're factory

11   installed.  It's just that they are not readily visible or

12   cannot be confirmed as defective or a problem or whatever.

13       Q    So a hidden part might occur if an owner finds a

14   problem after the repair?

15       A    No.  The shop would find it as they're doing the

16   repair.

17       Q    Would the shop come back to you then if they found

18   a hidden part?

19       A    Correct.

20       Q    What would that discussion be?

21       A    We decide if it's repairable or replace, same

22   thing as everything else.  Is it repair or replaceable.  If

23   it's repairable, what do you need to fix it.  He's going to

24   have to set it up on the frame machine and pull it straight

25   again.  I have had shops tell me that they needed 20 hours

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 103

1    was as a manager.

2         MR. PANTUSO:  Object to form.

3    A    He was okay as a manager.

4    BY MS. STRANGE:

5    Q    And did you ever take any of the I-CAR classes to

6    get you to the gold level?

7    A    It was on my ILP, the Individual Learning Plan,

8    that that was one of my goals.  What normally happens is

9    obviously January, February, March, busy, busy, busy.

10   Summer rolls around, it's still pretty busy.  Then it turns

11   into near the end of the year, and you got to get these

12   I-CAR classes in, which is exactly what happened last year.

13   I made the request to him.  I reiterated it's on the ILP,

14   and the ILP is something that in essence they pull back out

15   and say, okay, let's see what we've completed off the ILP.

16   So when he denied the class, I knew things were way wrong

17   then.

18   Q    Now, you said that your unit was seeking gold

19   certification.  Describe for me how the New Britain office

20   was structured when you worked there.

21   A    To what end?  Specifically, I mean --

22   Q    Were there other units other than the one you

23   worked in?  Let me rephrase that.

24        When you came to work for Safeco, you worked for

25   the New Britain office, correct?

Brandon Smith Reporting Service

Mike vs Safeco Insurance Co.

6/3/2003                                                        William Mike

Page 104

1        A    I was there for two and a half months.  Once I

2    actually was licensed, I was out of my house.  So the only

3    reason I was in New Britain was two and a half months of

4    training.

5        Q    Now, the training that you attended, was that in

6    New Britain?

7        A    Yes, it was.

8        Q    And that was in your first two and a half months

9    of employment?

10       A    Right.

11       Q    And who conducted the training?

12       A    Tom Farish, my boss, had an outline, and it was

13   that outline that I had to go through, read mods and do

14   tests.  The net end result was that background gave me the

15   knowledge to do the state test for the licensing.  And then

16   there was the practical part of the state test, which was

17   going to a shop and doing a hands-on estimate with a guy.

18       Q    Now, when you were hired, Tom Farish was your

19   boss; is that correct?

20       A    Well, actually, Mike McCullough and Tom Farish

21   were the two gentlemen that hired me.  I believe Tom was

22   Mike's boss, but the outline was developed by Tom Farish.

23       Q    Was that a training outline that was used in other

24   Safeco offices?

25       A    I don't know.

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 112

1    field adjuster as somebody who handled all aspects of field

2    work for auto damage claims.  Other than what -- let me

3    rephrase that.  Is that the job that you described to me

4    earlier in this deposition?

5        A    All aspects of auto damage claims, yeah,

6    including, like I say, the photos, the documentation, the

7    payments, the supplements, the phone calls, the problems.

8        Q    Now, you say in your resume that this included

9    motorcycle and boat damage.  Did you investigate motorcycle

10   and boat damage?

11       A    Yes, I did.

12       Q    When you were at Safeco, did all other claims

13   representatives investigate motorcycle and boat damage?

14       A    Yes, they --

15            MR. PANTUSO:  Object to form.

16       A    -- did.

17   BY MS. STRANGE:

18       Q    How do you know --

19       A    Which is a problem, because you can't do

20   motorcycles or boats on Pathways.

21       Q    So why is that a problem?

22       A    It makes -- everything has to be done longhand.

23   It takes five times the amount of time.  In other words, I

24   don't have access to a database that says this part is this

25   much and labor, so I would have to actually compile a list,

Brandon Smith Reporting Service

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 117

1    isn't straight and, you know, it's a mess.  So I think the

2    best answer I can give you is they were sent out based on

3    ZIP codes and owner's locations to reps who had those given

4    ZIP code territories, but that still didn't mean the car was

5    there, and I had no idea on five jobs whether I was going

6    into five nightmares, five totals or five, you know, $800

7    repairs.

8        Q    Okay.  And is that true for all of the reps?

9        A    Pretty much, yeah.  And I guess that's more our

10   role, you know, what is it, is it 800, is it 8,000.

11       Q    So as a rep, you would need to decide whether it

12   was a big nightmare job or a more simple job?

13           MR. PANTUSO:  Object to form.

14       A    Well, in essence, I get a bunch of information off

15   the car, year, make, model, blah, blah, blah, blah.  I can

16   start my estimate and then punch in a couple numbers, find

17   out where the threshold is, where that 75 percent is.  So if

18   I'm at $6,800 and 75 is the limit and I'm pretty sure

19   there's going to be $800 in damages, I'm not going to

20   authorize any additional work.  It's going to be I think

21   there's enough hidden damage there that the car is a total

22   loss.  The worse thing in my opinion that we can do as field

23   reps is rebuild cars that shouldn't be rebuilt.

24       Q    Now, if you believed a car was a total loss when

25   you're a claims rep, would you have to call the claimant to

Mike vs Safeco Insurance Co.

6/3/2003                                                        William Mike

Page 118

1    tell them that?

2              MR. PANTUSO:   Object to form.

3         A    At one point we were doing that where we handled

4    the whole total loss procedure.  I would call you up, you

5    know, "It's a total loss.  Have you done any repairs on this

6    thing?  Get me the additional paperwork.  I got to run you a

7    value.  I can cover some of your cost for the repairs."

8    Call up CCC, have an evaluation run on the vehicle, and

9    that's going to be your settlement amount.

10             It got to the point where they implemented a total

11   loss department so that we would make the initial phone

12   call, and then the next step would be to say, well, as

13   totaled, we'll touch base with you and handle it from

14   there.

15        Q    When did they implement the total loss department?

16        A    Not long ago.  Within the last eight, ten months,

17   year, something like that.

18        Q    Before that, you said that you would decide if the

19   vehicle was a total loss?

20        A    We would determine if it's repairable or total.

21   We would contact the owner and take care of the title, the

22   liens, the paperwork and everything else.

23        Q    And would you take care of situations where the

24   owner either didn't agree it was a total loss or thought the

25   car was worth more than --

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 119

1        A     We handle situations where primarily if they

2    wanted to retain the car, it could be retained.  If you

3    think your car is worth $11,000 when we came up with

4    $10,000, then we're back to that same scenario where I would

5    explain you can hire an independent to come in and run a

6    value on the vehicle, pretty much do the work I did.  If his

7    number is vastly greater than my number, then the whole

8    thing goes to like a negotiation process, which I'm out of.

9        Q     What if there's a situation where you call me as a

10   car owner and tell me it's a total loss, and I say that's

11   fine, but I want credit for my brand new tires that I just

12   put on the car?

13       A     That was exactly what I was addressing before,

14   where, yeah, some repairs, tires, maintenance items, I would

15   put everything on hold.  You would have to send me the

16   slips, fax them, mail them, whatever it is.  I would call up

17   the valuation with what the difference is; on this date $500

18   for tires, on this date a water pump, da, da, da,da.  And

19   CCC, the company that does the valuations for us, would come

20   back with a revised amount.

21       Q     Now, you said in some instances if we couldn't

22   agree on a revised amount, it would go to a negotiation

23   process?

24       A     It could go to a second arbitration process,

25   yeah.  Out of a whole lot of totals, I think it only

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                William Mike

Page 120

1    happened once, and we were at dead nuts with what the other

2    guy came up.

3         Q    Other than that one time, were you able to resolve

4    all of your other total losses directly with the claimant?

5         A    Yes, I was.

6         Q    Would that take some back-and-forth discussions

7    sometimes with the claimant to address concerns?

8              MR. PANTUSO:  Object to form.

9         A    I wouldn't say back-and-forth discussion, because

10   the discussion was cut and dry.  It went something like

11   this:  I'd explain to them that I looked at the car.  I've

12   come up with a dollar estimate.  The car value is worth, you

13   know, approximately X amount, and I think there's going to

14   be enough damage where the car is going to be a total.  So

15   at that point, I would run a valuation through CCC, get back

16   to you with the actual dollar amount, and that was that.  If

17   you weren't happy, there was nothing I was going to do,

18   because this was supplied to me from an independent

19   company.  We pay them, you know, a lot of money to run the

20   values for us.  So unless you could say, yes, that I have

21   some refurbishment slips, which, in all honesty, only

22   10, 15 percent maybe of that is recoverable, but those are

23   the items that I could do.

24        Q    Do you take credit for the fact that a lot of your

25   claims did not have to go to the negotiation stage?

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                          William Mike

Page 122

1    much overtime, yeah.

2        Q    Now, scene investigations is mentioned in your

3    resume.  Did anyone tell you when you got to a scene exactly

4    how you had to conduct the investigation?

5        A    It was delegated somewhere along the line that

6    scene investigations could be done by field people.  So

7    initially, no, I never did scene investigations, but then,

8    yes, do a scene investigation.  I'd get an assignment, it

9    would say check the intersection of Locust and "Blah" Street

10   in Hartford.  It may or may not have more information on the

11   task specifically.  You know, and this is all the inside

12   people.  Some are so thorough they give you the story.  Some

13   don't.  You know, so if there was a question, I get to the

14   intersection, the first thing I usually do is call the Call

15   Center to get more information.  They could get me from

16   there to where hopefully I could touch base with the inside

17   person.  80 percent of the time I got their voice mail, so I

18   could not get the answer I wanted when I needed it, and in

19   essence got very good at getting pictures, documenting

20   street signs, speed limits, crosswalks, measuring diameters

21   of roadways, and, you know, and everything else.

22       Q    Now, when did you start doing these scene

23   investigations?

24       A    Ask them.  I don't know.  Probably within the last

25   year-ish, year and a half-ish.

Mike vs Safeco Insurance Co.

6/3/2003                                                              William Mike

Page 146

```
1       Q    So if somebody had right front damage that had
2   been hit in the rear, would you just process that claim for
3   payment?
4       A    I would -- usually they give a location, yes.  If
5   the damage is in the location per the paper, I'm a little
6   more convinced.  If there was a gray area or a question, I
7   got on the phone to the Call Center for either additional
8   information or, you know, why do I see this on the opposite
9   side or what was the color of the other car, those kind of
10  things.
11      Q    If you get on the phone with the Call Center and
12  you got additional information and you still had a question,
13  were there circumstances where you would --
14      A    Okay, no.
15      Q    I haven't finished the question.
16      A    The reason being
17           MR. PANTUSO:  Let her finish the question.
18  BY MS. STRANGE:
19      Q    Are there circumstances where you would tell a
20  claimant this isn't covered, because it doesn't appear to be
21  part of the accident?
22      A    Unrelated damage, yes, I would -- and, again,
23  insurance claimants are always going to say it's related
24  damage.  I need to put the time in, call the Call Center,
25  get locations, get ideas, how big was the other car.  Bumper
```

Brandon Smith Reporting Service

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

---

Page 148

1      Q    Did you also do any type of fraud review when you

2    first reviewed a claim?

3          MR. PANTUSO:  Object to form.

4      A    Not initially, and for like two years, no, but

5    then just like motorcycles and boats and scene

6    investigations, that became a little bit of a thing.  In

7    other words, if we saw something that wasn't quite right, we

8    were directed to do SIU's.

9    BY MS. STRANGE:

10     Q    What's an SIU?

11     A    Special Investigation Underwriting Report.

12     Q    What would be in that report?

13     A    Anything -- okay.  An example:  The car had a limb

14   fall on the roof.  The repair is $7,000.  There's 12 other

15   big trees around his garage, and the guy has homeowner's

16   through Safeco.  So they want us, you know, as the eyes and

17   ears, do an SIU, make note that, you just spent $7,000 on

18   this, he's got two other cars sitting there and 12 large

19   trees around the house.  So we ended up doing a whole lot

20   more than initially.

21     Q    Did that increase in responsibility increase with

22   your experience level?

23     A    No.

24     Q    What do you base that increased responsibility on,

25   then?

---

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                      William Mike

Page 149

1          MR. PANTUSO:  Object to form.

2     A     Probably Safeco trying to save money, because

3   we're already out in the field and we're capable of noticing

4   situations that obviously inside people can't see, you know,

5   like I just explained.

6   BY MS. STRANGE:

7     Q     Now, your initial training, was fraud detection

8   covered as part of your job?

9     A     No.  And I wouldn't say in that particular case

10  it's fraud detection.  It's more so they can do an

11  investigation and correct their rates.

12    Q     Was there ever a circumstance where you saw an

13  obvious fraud?

14    A     No, and I've done a few car fires, too, and a

15  couple obvious causes, but not frauds.

16    Q     How would you know whether there was fraud in a

17  car fire?

18    A     Because I looked at it with the shop owner, and we

19  were both in conjunction on this particular fire that the

20  fire was a result of the oil filter that loosened up, and

21  the oil is under 60 pounds pressure, and once it loses the

22  gasket or starts to displace a little bit, it's coming out.

23  The car is going forward, oil filter is in the front.

24  What's right in back of it?  The exhaust pipe.  It starts to

25  go back through the block or blown back on the engine.  It

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 150

 1    was all the way to the back of the car, as a matter of fact

 2    on this one, and the fire was restricted to a very small

 3    portion of the exhaust system.  And without my mechanical

 4    knowledge, that may have been hard to figure out.

 5        Q    I couldn't.  I wouldn't figure it out.

 6             So in a case like with the fire, the car fires,

 7    would you look for -- would you suspect fraud or look for

 8    fraud initially?

 9        A    I have never been sent to a fire detection

10    school.  I have never been sent to a fraud detection

11    school.  So unless I can say I saw a guy light it on fire, I

12    can't do a thing.

13        Q    Well, could you report something obvious?  For

14    example, if somebody reports a stereo stolen and you get to

15    the car and there's no stereo mounted anywhere in the car,

16    no signs of a stereo, is that something that you would

17    report?

18        A    Not as fraud.

19        Q    Would you report it somewhere?

20        A    Probably to an SIU.  I mean, you get break-ins and

21    interior is missing.  And I was saying to him earlier, in

22    Hartford for a long time they were stealing Hondas with

23    leather interiors.  The leather seats, once they take them,

24    it's enough to total the car.  You can't find used seats,

25    and they're very expensive.  So somebody was stealing Honda

Mike vs Safeco Insurance Co.

Page 151

1    leather interiors for a long, long time.  I was talking to

2    reps from other companies and they're going, "What about the

3    Honda deal?"

4             As far as fraud, you know, I look at a car fire

5    and a burn, and I've seen some complete burns that are just

6    absolutely messes, but I don't feel I have the

7    qualifications to say fraud, no.

8        Q    Would you have the qualifications, though, and the

9    job responsibility to report something to SIU that looked

10   suspect?

11       A    Sure, if it was, yeah.

12       Q    What would happen from there?

13       A    I don't know.  SIU does their thing.  They

14   actually take it and review it and decide whether they want

15   to pursue it.  At one point they were promoting us to do the

16   SIU's, but then SIU got swamped, so then they started

17   rejecting a lot of the claims we gave them.

18       Q    SIU would reject the claim?

19       A    Right.  They just physically -- you know, manpower

20   time, whatever.

21       Q    If SIU rejected the claim, would you go back and

22   then handle the claim as you would have otherwise?

23       A    I handle the claim anyway.  It's just that the

24   referral to SIU would have them -- I think they actually

25   have a computer system they can go through and see if the

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                      William Mike

Page 154

1      A    I could not tell them whether it was okay to pay.

2   I would go back and do all the reading, on this day I looked

3   at it, I had the no okay to pay and the damage estimate is

4   on file, the pictures are on file.  It's up to the inside

5   person to decide exactly that, is it okay to pay.

6      Q    If the inside person decided it was okay to pay on

7   a no okay to pay, would they generally rely on the number

8   you agreed to pay?

9      A    Yes, they would rely on it, and I would get

10  e-mails back saying, "This is okay to pay now.  You can pay

11  it."  And this is well after the fact.  Again, I said to my

12  boss, I says, "I run around all day.  I come back and

13  there's an e-mail saying I can pay this.  Whoever sent me

14  this e-mail has been sitting at their terminal all day long

15  and could have made the payment.  Who's supposed to make

16  this payment, Dave?"  The inside person.  So I kind of

17  bailed out on that point, too.

18     Q    When did you do that?  When did you have that

19  conversation?

20     A    We've had that conversation many times from

21  Dave Kabara and with Jeff and Fran.

22     Q    And before having that conversation, would you

23  make the payment in that situation?

24     A    Yes.

25     Q    Now, on this paperwork it talks about betterment

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                            William Mike

Page 155

1    and depreciation.  What do those terms refer to?

2         A    Betterment is if I am buying -- I'll use the same

3    example on this corner, but he's got damage on the right

4    front bumper, kind of from here.  His damages is limited to

5    a light and a front bumper.  On this corner he's got old

6    damage.

7         Q    On the left-hand side?

8         A    Right.  So I'm convinced our impact is this side,

9    this is old damage.  I talk to you about it, explain it,

10   yes, it's old damage.  You agree.  Yet, because the damage

11   over here is bad enough, I'm going to buy you a new bumper.

12        Q    If the damage on the right is not repairable,

13   you'll buy a whole new bumper, which will clean up the

14   problem with the left?

15        A    Will get rid of the damage on the left that's not

16   related damage.  So I would apply some betterment to you.

17   What it is is a percentage or an out-of-pocket cost to you

18   for that.  You can theoretically end up in a better position

19   than you were prior if it's unrelated damage.  That is the

20   main reason to apply betterment.

21        Q    Were you supposed to avoid betterment in your

22   position?

23        A    I'm sorry?

24        Q    Were you supposed to avoid --

25        A    No, no, no, because that actually worked out

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 156

1   cheaper for Safeco that way.

2       Q    I was looking at your notes that said avoid

3   betterment.

4       A    I don't know what you're reading there.

5       Q    With the betterment, how would you know that the

6   left side was not part of the accident?  Was that based on

7   your initial determination?

8       A    I'm sorry.  I'm still reading betterment.

9       Q    In the example you described, how would you know

10  that the left side wasn't part of the accident?

11      A    Because the damage is no further over than 20 or

12  30 percent of the corner, there's nothing on the center, and

13  the center grill and hood are not damaged.

14      Q    Now I want to direct your attention to 0167 at the

15  very bottom where it talks about the role of a claim

16  adjuster.  Do you see that?

17      A    Yes.

18      Q    Do you agree with that description?

19           MR. PANTUSO:  Object to form.

20  BY MS. STRANGE:

21      Q    Where it says, "Claim adjuster investigates,

22  evaluates and settles claims."

23      A    Are you calling that the inside or outside

24  person?

25      Q    Let me ask you this, because these are your

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                William Mike

Page 157

1    notes:   What does that reference refer to where it says,

2    "Claim adjuster investigates, evaluates and settles

3    claims"?

4          A    That is the inside person.

5          Q    Now, the investigation steps that are set forth

6    here, do those go to the inside person as well?

7               MR. PANTUSO:   Object to form.   What are you

8    referring to as the investigation steps?

9    BY MS. STRANGE:

10         Q    Why don't we go through the whole -- under claims

11   adjuster it says "investigates, evaluates and settles

12   claims."  Is it your testimony that this only applies to

13   inside claims adjusters?

14         A    I would actually have to go back to ENV-201 and

15   find it in their book to clarify that.

16         Q    So do you know --

17         A    To investigate and evaluate and settles claims has

18   to be the inside person.

19         Q    As the outside person you investigated claims,

20   correct?

21         A    I look at them, yeah.

22         Q    Is there a difference in your mind between looking

23   at a claim and investigating it?

24         A    Not necessarily, but maybe in some ways.

25         Q    If you looked at a claim, did somebody else

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                          William Mike



Page 209

1                    C E R T I F I C A T I O N

2
       STATE OF CONNECTICUT:
3      COUNTY  OF  HARTFORD:

4
              I, TIFFANY V. PRATT, a Notary Public duly
5      commissioned and qualified in and for the State of
       Connecticut, do hereby certify that pursuant to Notice there
6      came before me on the 3rd day of June, 2003, the following
       named person, to wit:  WILLIAM MIKE, who was by me duly
7      sworn to testify to the truth and nothing but the truth;
       that he was thereupon examined upon his oath; that the
8      examination was reduced to writing by computer under my
       supervision and that this transcript is a true record of the
9      testimony given by said witness.

10            I further certify that all exhibits for
       identification were retained by Attorney Strange.

11
              I further certify that I am neither attorney nor
12     counsel for, nor related to, nor employed by any of the
       parties to the action in which this deposition was taken,
13     and further, that I am not a relative or employee of any
       attorney or counsel employed by the parties hereto, or
14     financially interested in the outcome of this action.

15            In witness whereof I have hereunto set my hand
16     this  12th  day of    June      , 2003.

17

18

19

20                              Tiffany V. Pratt
                                Notary Public

21

22     My Commission expires
           July 31, 2005

23

24

25

46a42447-22fb-484d-b2a2-6c414c5d7210