UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM E. MIKE | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| | : | |
| - against - | : | 3:02 CV 2239 (DJS) |
| | : | |
| SAFECO INSURANCE COMPANY | : | |
| OF AMERICA, | : | |
| Defendant. | : | APRIL 27, 2005 |

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AS TO LIABILITY AND LIQUIDATED DAMAGES

I.    INTRODUCTION

Pursuant to Rule 7(d) of the Local Rules of Civil Procedure, Plaintiff William E. Mike

hereby replies to Defendant's Opposition to Plaintiff's Motion for Summary Judgment as to

Liability and Liquidated Damages, dated March 14, 2005.[1]

II.    ARGUMENT

A.    There Is No Dispute That Plaintiff's Actual Duties Were Non-Exempt

At pages 5 through 9 of its Memorandum, Defendant sets forth the duties that it claims

Plaintiff performed. Defendant then argues, at pages 28 through 33, that these duties are exempt,

and differ substantially from those duties found to be non-exempt in *Reich v. American*

*International Adjustment Co., Inc.*, 902 F. Supp. 321 (D. Conn. 1994) ("*AIAC*"), *In Re Farmers*

*Insurance Exchange Claims Representatives' Overtime Pay Litigation*, 336 F. Supp.2d 1077 (D.

Or. 2004) ("*Farmers Insurance*") and  *Robinson-Smith v. GEICO*, 323 F. Supp.2d 12 (D.D.C

---

[1]This Reply does not address all of Defendant's arguments.  Plaintiff requests oral
argument in order to more fully address all of the issues raised.

**ORAL ARGUMENT IS REQUESTED**
**TESTIMONY IS NOT REQUIRED**

2004).  Defendant claims that Plaintiff not only inspected damaged automobiles, prepared repair

estimates and reached an agreed cost of repair with a repair shop, but also conducted scene

investigations, canvassed for witnesses, interviewed witnesses and obtained recorded statements,

participated in litigation and settled claims with customers, claimants or attorneys.  Defendant

argues that these "additional" duties lift Plaintiff's job above the non-exempt appraisers in *AIAC*,

*Farmers Insurance* and *Robinson-Smith*.  *See* Defendant's Memorandum at 29, 31, 33.  In fact,

Plaintiff did not perform all of the duties described by Defendant, and Defendant has put forth no

evidence to the contrary.  The evidence relied upon by Defendant clearly shows that Plaintiff was

engaged in nothing more than gathering facts – exactly the type of duty that Judge Covello found

to be "the essence" of the automobile damage appraisers' duties in *AIAC*, 902 F. Supp. at 324,

and that also was found to be non-exempt in *Farmers Insurance* and *Robinson-Smith*.

For example, Defendant cites to page 122 of Plaintiff's deposition to support its claim

that Plaintiff performed "scene investigations."  A further review of his testimony, however,

shows that these "scene investigations" were assigned to Plaintiff by Defendant's inside adjusters

and consisted of nothing more than "getting pictures, documenting street signs, speed limits,

crosswalks, measuring diameters of roadways, and, you know, and everything else."  (Mike

Deposition, Exhibit 2 to Defendant's Memorandum, at 122).  Such activities are nothing more

than gathering facts for use by the adjusters.

Defendant also states, at page 8 of its Memorandum, that "Plaintiff testified that, as part

of the investigation process, he also interviewed witnesses and obtained written and recorded

statements."  Defendant does not cite any evidence to support this assertion, and, in fact, Plaintiff

did not so testify.  A review of the transcripts of all three days of Plaintiff's deposition reveals

2

that he never was asked about interviewing witnesses or obtaining statements. Even if Plaintiff

did perform these tasks, however, they again are nothing more than fact-gathering and do not

require sufficient independent discretion and judgment to rise to the level of exempt duties.

Defendant claims, at page 9 of its Memorandum, that "Plaintiff testified that he

represented Safeco during legal proceedings." Again, there is no citation to the record, and, in

fact, this claim is directly contradicted by Plaintiff's testimony. Plaintiff testified that he never

had his deposition taken before this case. *See* Deposition of William Mike, relevant portions of

which are attached as Exhibit Q, at 6. The only trial at which he ever testified was his own

divorce. *Id.* at 32. While Defendant's training materials list attendance at trials, depositions and

hearings as possible duties of a PD Rep such as Plaintiff, Defendant has presented no evidence

that Plaintiff ever performed these duties. Defendant thus cannot rely upon Plaintiff's alleged

"participate[ion] in the litigation process on behalf of the defendant" (Defendant's Memorandum

at 29, 31, 33) to support its argument that Plaintiff performed exempt duties.

Lastly, Defendant asserts that Plaintiff "negotiated settlements with claimants, customers

and attorneys." Defendant's Memorandum at 9. Again, this claim is unsupported by any citation

to the record, and is contradicted by Plaintiff's testimony. Indeed, Plaintiff repeatedly testified

that he did not settle claims, but merely reached an agreed cost of repair:

> Q.   And then after you make those adjustments to be done, you know, to take
> care of it, could you as a claims rep at Safeco settle the claim?
>
> MR. PANTUSO:  Object to form.
>
> A.   I don't settle. I get an agreed cost. I don't settle any claims. My purpose is
> the car, what's the car going to take to fix it.

• • •

3

Q.   And are you able to eventually settle a claim based on negotiating the blend times?

A.   Yeah.  Well, not settle the claim.  Settle the agreed cost.

Q.   When you say "settle the agreed cost," how is that different from settling the claim?

A.   The claim is the entire picture of hospital visits, body damage, the car.  The inside people handle that scope.  I get my work from the inside person that says, "This guy is in the hospital.  I think we better have this car looked at."  I've done fatalities.  So, in essence, I'd say, yes, it is.

Q.   Were there some of your claims that you could resolve once you had the agreed upon cost, like claims that didn't have hospital or other bills?

A.   No.

Q.   Why not?

A.   I was strictly handling agreed cost for the repairs.  My purpose was to get to ACOR with the shop and that's what's it going to take to get this to the shape it was before the accident.

• • •

Q.   I guess I'm a little confused.  Were there times when you would settle a claim within your authority level and get the insured and the shop's agreement?

MR. PANTUSO:  Object to form.

A.   I would get an agreement cost with the shop.  Settling a claim means the claim is done and completed and everything else.  Settling the claim is done by the inside people, and it cannot be done until the car, the person, the hospital bills or whatever else are taken care of, or supplements.

• • •

Q.   Were there instances where the car repair was the only claim?

A.   I assume so.

Q.   In those instances, would the settlement of the car repair cost settle the entire claim?

A.   It would be a step towards it.  Then the inside adjuster would do whatever they have to do, and they're the one that goes in and close the files.

Mike Deposition, Exhibit Q at 43-44, 73-75, 127-128.

The undisputed evidence in the record makes it clear that the only "negotiating" and "settlement" that Plaintiff undertook was to reach an agreed cost of repair – precisely the same type of "negotiating" and "settlement' that was found to be a non-exempt duty in *AIAC, Farmers Insurance* and *Robinson-Smith*.

B.    The Undisputed Facts Establish That Plaintiff Was A Production Worker Whose Duties Did Not Directly Relate To Defendant's Management Policies Or General Business Operations

Defendant's argument that Plaintiff was not a production worker, and thus that his duties directly related to Defendant's management policies and general business operations, requires an overly restrictive reading of what constitutes "production work."  Further, Defendant's claim that *Farmers Insurance* and *Robinson-Smith* support its position misreads those cases.

At pages 19 through 22 of its Memorandum, Defendant contends that Plaintiff cannot be a production worker, because its business is to produce and sell insurance policies and not to settle claims.  Defendant does not claim that investigating, processing and resolving claims is not part of its business.  Indeed, Defendant maintains a separate Claims Department for just that purpose.  *See, e.g.*, Exhibit F at M0002744-M0002745.  Plaintiff's role in the Claims Department did not relate to the administrative operations of Defendant's business, but rather produced repair estimates and contributed to resolving claims – the products of the Claims Department.

5

"The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). As noted above, Defendant has produced no evidence to show that Plaintiff's primary duties involved any of the above, with the sole exception of "negotiating" an agreed cost to repair a vehicle, which was found to be a non-exempt duty in *AIAC, Farmers Insurance* and *Robinson-Smith*.

Defendant also argues, at pages 22 through 26 of its Memorandum, that this Court should find that Plaintiff was not a production worker, because both the *Farmers Insurance* and *Robinson-Smith* courts ruled that automobile appraisers are not production workers. This argument misstates the actual holdings of these cases.

In *Farmers Insurance*, the District Court for the District of Oregon relied upon the Ninth Circuit case of *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002) to conclude that the "administration/production dichotomy" had no usefulness to "modern-day post-industrial service-oriented businesses." 336 F.Supp.2d at 1087. Thus, the *Farmers Insurance* court refused to apply the "administration/production dichotomy" analysis in reaching its conclusions. 336 F.Supp.2d at 1088. Similarly, in *Robinson-Smith*, the District Court for the District of Columbia expressly declined to use the "administration/production" dichotomy. *Robinson-Smith*, 323 F.Supp.2d at 23 n. 6. Because these courts specifically did not use this analysis, any suggestion that they found that automobile appraisers are not production workers is misleading.

The law in the Second Circuit on the "administrative/production dichotomy" differs from that of the Ninth Circuit and the District of Columbia. In *Reich v. State of New York*, 3 F.3d 581

6

(2d Cir. 1993), the Second Circuit rejected the argument that the "administrative/production

dichotomy" should not apply outside the manufacturing sector. 3 F.3d at 588. Therefore, the

"administrative/production dichotomy" analysis not only is properly applied to this case, it is

required. Because this analysis was not applied in *Farmers Insurance* or *Robinson-Smith*, neither

of those cases can be interpreted as rejecting the argument that an automobile appraiser is a

production worker, and thus non-exempt.

C.    The Undisputed Facts Establish That Plaintiff Did Not Perform the Duties Of An
      Insurance Claim Adjuster

Defendant makes the additional claim at pages 33 through 36 of its Memorandum that

Plaintiff performed the exempt duties of an insurance claims adjuster, as set forth in the

November 19, 2002 opinion letter from the United States Department of Labor ("DOL Letter")

(Exhibit 11 to Defendant's Memorandum). A review of the evidence presented by both parties,

however, clearly establishes that Plaintiff only performed the fact-gathering duties described in

the DOL Letter. Plaintiff did not perform the remainder of the duties set forth in the DOL Letter,

those that may require the exercise of independent discretion and judgment.

For example, the DOL Letter states that, in preparing damages estimates, claims adjusters

consider such things as "time lost from work, damages to personal property, the nature and extent

of bodily injury, medical bills and pain and suffering." DOL Letter, Exhibit 11 to Defendant's

Memorandum. Defendant has put forth no evidence that Plaintiff considered any such factors in

preparing his estimates. Indeed, as Plaintiff's Affidavit (Exhibit A) makes clear, Plaintiff's only

responsibility was the damaged vehicle. He had no responsibility for anything related to time

lost from work, medical bills, bodily injury or pain and suffering. *See also* Mike Deposition, Exhibit Q at 73-75.

The DOL Letter also states that claims adjusters "must evaluate whether there is coverage for the claim under the policy." DOL Letter, Exhibit 11 to Defendant's Memorandum. Plaintiff never made coverage determinations. See Mike Affidavit, Exhibit A at ¶ 15. Defendant cites, at page 35 of its Memorandum, to page 146 of Plaintiff's deposition to support its assertion that Plaintiff made coverage determinations, but that citation does not support this claim. Rather, at pages 144 and 145 of Plaintiff's deposition, he made clear that he did *not* make coverage determinations:

> Q.   Did you ever have a question as a claims field representative as to whether a claim was covered under a particular insurance policy?
>
> A.   A lot of the coverage items were supposed to have been delegated by the people that capture the claims, so they were the ones to determine a couple things, do we need to have somebody look at it, is there coverage for it, whatever else they actually do.
>
> Q.   Did you ever have questions about whether something was covered?
>
> A.   Yes.
>
> Q.   And as a claims rep, if you questioned coverage, what could you do about that?
>
> A.   About all I could do in the field is call the Call Center.

See Mike Deposition, Exhibit Q at 144-145.

The claims adjusters at issue in the DOL Letter also "advise[d] the company on whether to settle the claim or pursue litigation." DOL Letter, Exhibit 11 to Defendant's Memorandum. Defendant has cited no evidence that Plaintiff ever advised it regarding settling claims or

8

pursuing litigation. Indeed, as Plaintiff testified, his assignments would tell him whether or not

he was authorized to pay. Mike Deposition, Exhibit Q at 147. Nor has Defendant presented any

evidence that Plaintiff "collaborate[d] with counsel and ma[de] recommendations in preparation

for litigation." DOL Letter, Exhibit 11 to Defendant's Memorandum. The claims adjusters in

the DOL Letter also "remain[ed] primarily responsible for resolving a claim, even when it is in

litigation. . . ." DOL Letter, Exhibit 11 to Defendant's Memorandum. As noted above,

Defendant has presented no evidence that Plaintiff had any litigation responsibilities, or even any

responsibilities that survived his initial inspection.

After excluding the above claims adjusting duties, Plaintiff clearly was not an adjuster.

He was an automobile damage appraiser. His job was to gather facts, prepare estimates, issue

payment if authorized, and return the file to the claims adjuster.

      D.      <u>Because Defendant Has Presented No Evidence To Support A "Good Faith"
Defense, Summary Judgment Should Enter In Plaintiff's Favor For Liquidated
Damages</u>

Liquidated damages under the FLSA are mandated unless the employer meets its burden

of establishing that it took active steps to ascertain the dictates of the FLSA and then acted to

comply with them. *Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d

Cir.1997); *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987). Defendant has presented no

evidence whatsoever to support its good faith defense, but merely argues that Plaintiff has not

proven bad faith. Defendant's Memorandum at 36-38. There is no evidence that Defendant

inquired of the Department of Labor whether its classification of Plaintiff's position was correct,

or that Defendant sought the opinion of counsel. *See Farmers Insurance*, 336 F. Supp. 2d at

1111 ("failure to obtain a formal opinion of counsel or the DOL . . . is not objectively reasonable

in terms of [the] obligation to make a good faith effort to comply with the requirements of the

FLSA and various state overtime laws")

There is no evidence that Defendant ever did anything to ensure compliance with the law.

Absent such evidence, Defendant has not met its burden of establishing its "good faith" defense.

Summary judgment thus should enter in Plaintiff's favor for liquidated damages.

**III.    CONCLUSION**

Defendant claims that Plaintiff performed various duties that it asserts are exempt, but

has not presented any evidence to support its claims.  The actual evidence before this Court

shows that Plaintiff's duties were the same as those at issue in *AIAC*, *Farmers Insurance* and

*Robinson-Smith* – duties that are non-exempt.  The undisputed facts also establish that Plaintiff

was a production worker whose duties did not directly relate to Defendant's management policies

or general business operations.  Contrary to Defendant's assertion, Plaintiff was not a claims

adjuster; the undisputed evidence shows that he was an automobile damage appraiser.  For these

reasons, Plaintiff is entitled to summary judgment as to liability.  Because Defendant has

presented no evidence to support its good faith defense, Plaintiff also is entitled to summary

judgment as to liquidated damages.

Plaintiff, William E. Mike

By:

Anthony J. Pantuso, III
Hayber & Pantuso, LLC
221 Main Street, Suite 400
Hartford, CT 06106
Fed No.: ct11638
(860) 522-8888
(860) 240-7945 (facsimile)

10

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was mailed on this date to the following counsel of record:

Margaret J. Strange                    William G. Madsen, Esq.
Jackson Lewis LLP                      Madsen, Prestley & Parenteau, LLC
55 Farmington Avenue                   44 Capitol Avenue
Suite 1200                             Suite 201
Hartford, CT 06105                     Hartford, CT 06106


Anthony J. Pantuso, III

11

# EXHIBIT Q

Mike vs Safeco Insurance Co.

6/3/2003                                                                William Mike

Page 1

1
2

                    UNITED STATES DISTRICT COURT

3

                    DISTRICT OF CONNECTICUT

4

- - - - - - - - - - - - - - - - - - - x        **COPY**
5   WILLIAM E. MIKE, Individually and          |
    on behalf of other similarly situated
6   individuals,                               |
                        Plaintiff,             Civil Action No.
7                                              | 3:02 CV 2239 (DJS)
                        vs.
8                                              | June 3, 2003
    SAFECO INSURANCE COMPANY OF                |
9   AMERICA,                                   |
                        Defendant.
10  - - - - - - - - - - - - - - - - - - - x
11
12
13                  DEPOSITION of WILLIAM MIKE
14
15
16              Taken at the request of the Defendant
            before Tiffany V. Pratt, a Court Reporter and Notary
17          Public within and for the State of Connecticut,
            pursuant to Notice and the Federal Rules of Civil
18          Procedure at the offices of Jackson Lewis, LLP,
            55 Farmington Avenue, Hartford, Connecticut, on
19          June 3, 2003, commencing at 10:36 a.m.
20
21
22
23              Tiffany V. Pratt, LSR #00128
            BRANDON SMITH REPORTING SERVICE, LLC
24                  44 Capitol Avenue
            Hartford, Connecticut  06106
25                  (860) 549-1850

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                      William Mike

```
Page 6

   1                   WILLIAM MIKE, Deponent, of 93 Bedlam Road,

   2          Chaplin, Connecticut 06235, being first duly sworn by

   3          the Notary Public, was examined and testified on his

   4          oath as follows:

   5

   6               D I R E C T   E X A M I N A T I O N

   7

   8     BY MS. STRANGE:

   9          Q    Good morning.

  10          A    Good morning.  How are you?

  11          Q    Good.  Could you state your name and address for

  12     the record, please?

  13          A    William Mike, 93 Bedlam Road, Chaplin,

  14     Connecticut.

  15          Q    Mr. Mike, have you ever had your deposition taken

  16     before?

  17          A    No.

  18          Q    My name is Peggy Strange.  I'm the attorney for

  19     Safeco, and I will ask you a series of questions.  If you do

  20     not understand a question, I assume you won't answer it.

  21     Otherwise, if you do answer a question, I will assume that

  22     you understood the question that was asked.  The court

  23     reporter can't take down nodding of the head or nonverbal

  24     responses, so you need to respond verbally.  And the

  25     testimony you're giving is under oath, so it would have the
```

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 32

```
 1   lawsuit.
 2       Q    Have you ever testified at trial or in any form?
 3       A    Divorce court.  I think that's the testimony.
 4       Q    When did you testify in divorce court?
 5       A    Oh, that was a couple years ago, three years ago.
 6       Q    How long was your testimony in divorce court?
 7       A    Brief.
 8       Q    What was the general nature of the testimony?
 9       A    I don't recall the subject matter.  It was just
10   answering, you know, a few questions.
11       Q    Were you working for Safeco at the time?
12       A    Yes.
13       Q    Did the questions have to do with your employment
14   at Safeco at all?
15       A    No.
16       Q    Now, what is your current marital status?
17       A    I'm divorced.
18       Q    Do you have any children?
19       A    Yes, I do.
20       Q    How many?
21       A    Two kids.
22       Q    What are their ages?
23       A    Dave is 14 and Michelle is 8.
24       Q    Do they live with their mother or with you?
25       A    Yes, they do, mother.
```

Brandon Smith Reporting Service

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 44

1    rep at Safeco settle the claim?

2             MR. PANTUSO:  Object to form.

3        A    I don't settle.  I get an agreed cost.  I don't

4    settle any claims.  My purpose is the car, what's the car

5    going to take to fix it.

6    BY MS. STRANGE:

7        Q    Did you have certain authority when you were a

8    claims rep at Safeco?

9             MR. PANTUSO:  Object to form.

10       A    I had a $5,000 authority level.  Most of the other

11   reps were considerably higher than that I believe.

12   BY MS. STRANGE:

13       Q    What is an authority level?

14       A    It just meant anything under that dollar amount I

15   could enter and put through myself, and it would

16   self-approve because of my authority level.  What it

17   actually does is decrease the amount of work going up the

18   line, because anything over $5,000 goes to the boss or the

19   next approval level.

20       Q    When you say anything over $5,000 goes to the boss

21   or the next approval level, while you were a claims rep, did

22   the next approval level typically approve your claims that

23   were over $5,000?

24             MR. PANTUSO:  Object to form.

25       A    Did they typically approve them?

Mike vs Safeco Insurance Co.

Page 73

1    disagree, or, well, I have an hour here blend time, this is

2    what we pay standard, you can do what you do with an hour.

3    I still need to get an agreement with him.  If he says, "I

4    got to blend" and I say, "You can't," we don't have an

5    agreement.

6          So what usually happens then, and it's pretty

7    justifiable most of the time, and there are ways to take

8    more time to make sure the shop actually does it and pay it

9    after the fact, but blend times on the Pathway system are

10   limited.  Actual blend times are higher than that.  So I

11   often do negotiate some blend times.

12      Q    And are you able to eventually settle a claim

13   based on negotiating the blend times?

14      A    Yeah.  Well, not settle the claim.  Settle the

15   agreed cost.

16      Q    When you say "settle the agreed cost," how is that

17   different from settling the claim?

18      A    The claim is the entire picture of hospital

19   visits, body damage, the car.  The inside people handle that

20   scope.  I get my work from the inside person that says,

21   "This guy is in the hospital.  I think we better have this

22   car looked at."  I've done fatalities.  So, in essence, I'd

23   say, yes, it is.

24      Q    Were there some of your claims that you could

25   resolve once you had the agreed upon cost, like claims that

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 74

1    didn't have hospital or other bills?

2        A    No.

3        Q    Why not?

4        A    I was strictly handling agreed cost for the

5    repairs.  My purpose was to get to ACOR with the shop and

6    that's what's it going to take to get this to the shape it

7    was before the accident.

8        Q    In the circumstances you described with the

9    blended paint, what if I am the owner and I want the

10   whole -- I want a whole new paint job?  Is that something

11   that you as a claims rep would discuss with an owner?

12       A    I could explain to you that your damage is in the

13   right front corner, I'm going to have the shop repair the

14   fender, paint the fender, blend the hood, blend the door.

15   It is $1,312.  You, if you like, have the option of an

16   out-of-pocket expense to have the rest of the car painted,

17   which would be three-quarters less, so to speak, but it's

18   nothing more that Safeco is going to pay or I'm going to pay

19   the cost for.

20       Q    Would that be your responsibility to explain to

21   the insured?

22       A    Yeah, that or any other gamut of questions.

23       Q    Would you have to get the insured's agreement on

24   that or any gamut of questions before you could put in the

25   claim for payment?

**Brandon Smith Reporting Service**

Mike vs Safeco Insurance Co.

Page 75

1       A    No.

2       Q    I guess I'm a little confused.  Were there times

3  when you would settle a claim within your authority level

4  and get the insured and the shop's agreement?

5            MR. PANTUSO:  Object to form.

6       A    I would get an agreement cost with the shop.

7  Settling a claim means the claim is done and completed and

8  everything else.  Settling the claim is done by the inside

9  people, and it cannot be done until the car, the person, the

10  hospital bills or whatever else are taken care of, or

11  supplements.

12  BY MS. STRANGE:

13      Q    With the assignments that you received, would you

14  resolve any issues with the shop and the insured within your

15  authority level?

16      A    Any issues pertaining to the car repair?

17      Q    Correct.

18      A    Yes.

19      Q    To resolve issues within your authority level or

20  even resolve issues over your authority level, would you

21  have to have the shop and the insured's agreement?

22      A    I think we've been through this a couple of times.

23      Q    Right.  I want to make sure I'm understanding it.

24      A    Repeat it.

25      Q    Sure.  If you were resolving the auto part of the

Brandon Smith Reporting Service

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 127

1    not really quite sure about that.  Mine was $5,000, and I

2    know it was the lowest out of probably everybody.

3        Q    Would the points toward the I-CAR certification

4    have anything to do with their authority?

5        A    No, because I had that authority before I had the

6    13 points, actually.

7        Q    And what does the -- what would a higher authority

8    enable these other claims field reps to do?

9        A    It just means there would be less going to the

10   other approver.  In other words, if I could input a $10,000

11   payment, that's one less for somebody else to be looking at.

12       Q    So they could settle claims for under $10,000

13   without other approval?

14            MR. PANTUSO:  Object to form.

15       A    No.  They could make payments for auto repairs

16   based on that.

17   BY MS. STRANGE:

18       Q    When you talk in your resume where you say you

19   handled claims through handling total loss claims and

20   settlements, what are you referring to there?

21       A    Payments, settlements, payments.

22       Q    If somebody paid a claim within their authority,

23   would that in some instances settle the entire claim?

24       A    No.

25       Q    Why not?

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 128

1        A     It would settle the agreed cost of the repair for

2    the car repair only.

3        Q     Were there instances where the car repair was the

4    only claim?

5        A     I assume so.

6        Q     In those instances, would the settlement of the

7    car repair cost settle the entire claim?

8        A     It would be a step towards it.  Then the inside

9    adjuster would do whatever they have to do, and they're the

10   one that goes in and close the files.

11       Q     The claims that you testified to that you were

12   able to negotiate, the car repair cost within your

13   authority, were any of those ever not closed by an inside

14   adjuster after you negotiated the car cost?

15             MR. PANTUSO:  Object to form.

16       A     Were the inside claims not closed?

17   BY MS. STRANGE:

18       Q     Right.  You just testified that an adjuster, an

19   inside adjuster, would have to actually close the file; is

20   that accurate?

21       A     Yes.

22       Q     Was there ever a case when you worked at Safeco

23   when one of your files was not closed by an inside adjuster

24   after you had negotiated the price with the shop and the

25   claimant?

Brandon Smith Reporting Service

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 144

1        A    Apparently per Tom Fairish, yes.

2        Q    Under the definition for indemnity, this is about

3    halfway down, it says, "Putting people back to the position

4    they were in before loss."  Is that a concept that you were

5    familiar with as a claims rep at Safeco?

6             MR. PANTUSO:  Object to form.

7        A    Yes.

8    BY MS. STRANGE:

9        Q    Was that one of your job responsibilities at

10   Safeco to put people back to the position they were in

11   before the loss?

12       A    No.  My position was to get their vehicle to that

13   position prior and after.

14       Q    Now, did you as a claims rep at Safeco ever review

15   the insurance policies that the people -- that the claimants

16   had?

17            MR. PANTUSO:  Object to form.

18       A    I did a little policy studying when I was doing

19   some of this background reading.  The policy I do not have a

20   copy of; I do not utilize in the field.  The policy is

21   accessible on line to the inside people.

22       Q    Did you ever have a question as a claims field

23   representative as to whether a claim was covered under a

24   particular insurance policy?

25       A    A lot of the coverage items were supposed to have

Brandon Smith Reporting Service

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 143

1       Q     Do you know if licensing requirements for

2    adjusters differ around the country?

3       A     I don't.  I assume it's pretty much the same

4    thing, which is some basic background reading, the written

5    test, and then the hands-on so to speak.

6                    (Defendant's Exhibit 3 marked for

7    identification; Auto notes.)

8    BY MS. STRANGE:

9       Q     I'm going to show you what's been marked as

10   Exhibit 3, and tell me if you recognize this document.

11      A     I think this might be what I typed off of my

12   handwritten notes during the period that I did my three

13   months of studying.  These are all my notes I believe.

14      Q     Do these notes apply to your position at Safeco

15   that you were hired for?

16      A     Say that again.

17      Q     Let me break it down for you.  Do you recall when

18   you prepared these notes?

19      A     As I was doing my two months of reading, I was

20   handwriting my notes, and I take my handwritten notes and

21   type them up so it's in a reasonable format.  That is what

22   this is, I believe.

23      Q     Going through these notes, the first page appears

24   to have definitions.  Were these definitions that you needed

25   to know in the performance of your position at Safeco?

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 145

1    been delegated by the people that capture the claims, so

2    they were the ones to determine a couple things, do we need

3    to have somebody look at it, is there coverage for it,

4    whatever else they actually do.

5        Q    Did you ever have questions about whether

6    something was covered?

7        A    Yes.

8        Q    And as a claims rep, if you questioned coverage,

9    what could you do about that?

10            MR. PANTUSO:  Object to form.

11       A    About all I could do in the field is call the

12   Call Center.

13   BY MS. STRANGE:

14       Q    Can you think of any examples when you questioned

15   whether a claim was covered?

16       A    The example of right front damage that is hit in

17   the rear I think would be an example of that.

18       Q    Would you decide in that circumstance based on

19   your judgment that the right front damage probably was not

20   covered?

21            MR. PANTUSO:  Object to form.

22       A    No, I wouldn't.

23   BY MS. STRANGE:

24       Q    Would you question whether it was covered?

25       A    No, I wouldn't.

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

6/3/2003                                                    William Mike

Page 146

1      Q    So if somebody had right front damage that had

2    been hit in the rear, would you just process that claim for

3    payment?

4      A    I would -- usually they give a location, yes.  If

5    the damage is in the location per the paper, I'm a little

6    more convinced.  If there was a gray area or a question, I

7    got on the phone to the Call Center for either additional

8    information or, you know, why do I see this on the opposite

9    side or what was the color of the other car, those kind of

10   things.

11     Q    If you get on the phone with the Call Center and

12   you got additional information and you still had a question,

13   were there circumstances where you would --

14     A    Okay, no.

15     Q    I haven't finished the question.

16     A    The reason being

17          MR. PANTUSO:  Let her finish the question.

18   BY MS. STRANGE:

19     Q    Are there circumstances where you would tell a

20   claimant this isn't covered, because it doesn't appear to be

21   part of the accident?

22     A    Unrelated damage, yes, I would -- and, again,

23   insurance claimants are always going to say it's related

24   damage.  I need to put the time in, call the Call Center,

25   get locations, get ideas, how big was the other car.  Bumper

46a42447-22fb-484d-b2a2-6c414c5d7210

Mike vs Safeco Insurance Co.

Page 147

1    heights affect all these things and everything else.  So, in

2    essence, if it was prior damage and I was convinced it

3    wasn't, then, yeah, I'm going to tell you what I see back

4    here is not related; my payment is going to be for the right

5    front.

6            If I got an assignment that said check right front

7    damage, but has no okay to pay, in other words, some have

8    yes, some have no, then there is still an issue that the

9    inside people are working out, whatever that detail is, I

10   don't know, but they want to know the extent of the damage

11   and want to have the photos.  So I would do that, upload

12   that on line, but not make any payments and then speak to

13   the owner as such that, well, I just looked at your car,

14   I've got some information I'm going to upload for the

15   adjuster, they'll have it as of tomorrow.  In essence,

16   trying to explain to you, don't bother calling me, because I

17   won't be able to tell you anything, but follow-up with

18   Tisha White or whoever was the inside person.

19       Q    Did you also receive forms that said okay to pay?

20       A    In the assignment sheet there was a section where

21   it was either Y or N.  If it was an N, obviously there may

22   be a coverage issue or whatever the inside people need to

23   know, and, yeah, I didn't make the payments.

24       Q    If there were a Y --

25       A    I am okay to make the payment for repair damage.

Brandon Smith Reporting Service

Mike vs Safeco Insurance Co.

Page 156

1    cheaper for Safeco that way.

2        Q    I was looking at your notes that said avoid

3    betterment.

4        A    I don't know what you're reading there.

5        Q    With the betterment, how would you know that the

6    left side was not part of the accident?  Was that based on

7    your initial determination?

8        A    I'm sorry.  I'm still reading betterment.

9        Q    In the example you described, how would you know

10   that the left side wasn't part of the accident?

11       A    Because the damage is no further over than 20 or

12   30 percent of the corner, there's nothing on the center, and

13   the center grill and hood are not damaged.

14       Q    Now I want to direct your attention to 0167 at the

15   very bottom where it talks about the role of a claim

16   adjuster.  Do you see that?

17       A    Yes.

18       Q    Do you agree with that description?

19            MR. PANTUSO:  Object to form.

20   BY MS. STRANGE:

21       Q    Where it says, "Claim adjuster investigates,

22   evaluates and settles claims."

23       A    Are you calling that the inside or outside

24   person?

25       Q    Let me ask you this, because these are your

Mike vs Safeco Insurance Co.

6/3/2003                                                          William Mike

Page 157

1    notes:  What does that reference refer to where it says,

2    "Claim adjuster investigates, evaluates and settles

3    claims"?

4         A    That is the inside person.

5         Q    Now, the investigation steps that are set forth

6    here, do those go to the inside person as well?

7              MR. PANTUSO:  Object to form.  What are you

8    referring to as the investigation steps?

9    BY MS. STRANGE:

10        Q    Why don't we go through the whole -- under claims

11   adjuster it says "investigates, evaluates and settles

12   claims."  Is it your testimony that this only applies to

13   inside claims adjusters?

14        A    I would actually have to go back to ENV-201 and

15   find it in their book to clarify that.

16        Q    So do you know --

17        A    To investigate and evaluate and settles claims has

18   to be the inside person.

19        Q    As the outside person you investigated claims,

20   correct?

21        A    I look at them, yeah.

22        Q    Is there a difference in your mind between looking

23   at a claim and investigating it?

24        A    Not necessarily, but maybe in some ways.

25        Q    If you looked at a claim, did somebody else

Brandon Smith Reporting Service

46a42447-22fb-484d-b2a2-6c414c5d7210